## In re Anonymous Nos. 47 & 89 D.B. 87 and 15 & 23 D.B. 88

Disciplinary Board Docket no. 47 and 89 D.B. 87, 15 and 23 D.B. 88.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

ECKELL, *Member,* April 19, 1990—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petitions for discipline.

## HISTORY OF PROCEEDINGS

Respondent, born on February 15, 1951, was admitted to practice law in the Commonwealth of Pennsylvania in October of 1976. His law office is located in [    ], Pennsylvania.

Office of Disciplinary Counsel filed four separate petitions for discipline against respondent as follows: no. 47 D.B. 87 ([A]/[B]), filed July 2, 1987; no. 89 D.B. 87 ([C]), filed November 30, 1987; no. 15 D.B. 88 ([D]) filed February 22, 1988; and no. 23 D.B. 88 ([E]) filed March 15, 1988. With respect to the [A]/[B] and [C] matters, respondent was charged with neglecting his clients' legal matters, failing to respond to his clients' reasonable requests for information, and failing to refund the unearned portion of the fee. In the [D] matter, it was averred that respondent failed to appear in court on behalf of his client and failed to petition the court to withdraw from employment after being discharged by his client.

In the [E] matter, Office of Disciplinary Counsel averred the following: Respondent settled his client's case without the client's knowledge or permission; negotiated a settlement draft and release in which respondent caused to be endorsed or endorsed his client's name without the client's knowledge; failed to advise his client of the settlement; failed to distribute settlement funds to his client;

utilized the proceeds of the draft for his own use; and in an effort to conceal his wrongdoing, prepared and submitted false documents.

The matters were referred to Hearing Committee [   ] comprised of [   ] on October 16, 1987, December 17, 1987, and May 3, 1988.

The four matters were consolidated for hearing with hearings held on April 11, 1988, June 7, 1988 (adjourned and rescheduled), September 19, 1988, January 6, 1989, and February 22, 1989. The hearing committee filed its report on October 30, 1989, in which the committee recommended that respondent be suspended for a period of one year and, in addition, be required to successfully complete a course in professional ethics.

On November 20, 1989, Office of Disciplinary Counsel filed a brief on exceptions in which petitioner excepted to the hearing committee's finding that respondent did not violate any Disciplinary Rules in regard to the [D] matter. Petitioner also excepted to the committee's recommended discipline of one-year suspension and urged that a "substantial period of suspension be imposed on respondent."

On December 4, 1989, respondent, through counsel, filed a brief on exceptions in which respondent took exception to the findings of fact, conclusions of law, and recommended discipline of the hearing committee. Respondent argues that the findings of fact of the committee are incomplete and not supported by substantial evidence. In addition, respondent argues that the committee's recommendation of a one-year suspension is excessive and urges that all disciplinary charges against respondent be dismissed.

Thereafter, the matter was assigned to a three-member panel of the Disciplinary Board for oral

argument and recommendation to the full board. Oral argument was heard on January 24, 1990, before board members Murray S. Eckell, Esq., John R. Padova, Esq., and Berle M. Schiller, Esq. The matter was adjudicated by the full board at its regularly scheduled meeting held on January 26, 1990.

## FINDINGS OF FACT

### A. *No. 47 D.B. 87, [A]/[B] Matter*

On October 15, 1984, Russian immigrants, [B] and [A], her son-in-law, met with respondent for an initial consultation. At that time, [B] and [A] advised respondent of their critical problem. [A] had signed an agreement to purchase a private club called [F] from a [G], Esq., and others. [A] had made a down payment in the amount of $22,660, utilizing funds obtained by [B] through savings and loans from friends, banks, and credit cards. [G], Esq., the primary representative of the sellers, maneuvered [A] into a position where he was facing the loss of his entire investment. [A] pointed out to respondent that the next payment under the agreement was due in two weeks, and it was his understanding that if the payment was not made he would be in default and would lose his options to enforce the underlying agreement as well as the substantial payment to date. Respondent advised [A] that it was not necessary to make the payment because he would resolve the matter within the two weeks' time. Respondent further advised [A] at the initial meeting on October 15, 1984, not to enter the place of business, [F], again, not to communicate with attorney [G], or make any payments to attorney [G] until respondent instructed him to do so. During this meeting, re-

spondent called attorney [G] and arranged a meeting for the following day.

After discussing the matter with [A] and [B], respondent agreed to handle the matter on an emergency basis and advised his clients that it would take approximately 20 hours of his time to resolve the matter and such resolution would be reached without going to court.

Respondent requested and received a $2,000 retainer fee from [B], which she paid to him at the initial meeting on October 15, 1984.

On October 17, 1984, respondent met with [B] and [A], advising them that he had met with attorney [G]. At this second meeting, respondent gave to his clients a telegram dated October 15, 1984, from attorney [G], in which attorney [G] threatened [A] with forfeiture and criminal action.

By the October 17, 1984, meeting, [B] provided respondent various documents relating to the legal matter as follows: exhibit P-1, lease agreement; exhibits P-2 through P-4, sale agreements and notes; exhibit P-5, letter dated October 5, 1984, to [A] from attorney [G], in which attorney [G] offers to take back the [F] business in an exchange for transferring to [A], attorney [G's] interest in another business; exhibit P-6, letter dated October 11, 1984, in which attorney [G] threatens [A] with default and arrest for trespass; and exhibits P-7a and P-7b, opinion and warning notice of the Pennsylvania Liquor Control Board of the suspension of [F's] liquor license.

Subsequently, [B] provided to respondent documents to evidence the sources of the funds paid by [A] to attorney [G] in accordance with the agreement. Thereafter, respondent forwarded to his clients a letter dated October 18, 1984, in which attorney [G] offered [A] the option of selling two-thirds of the shares of [F] Inc. under certain condi-

tions. Shortly afterwards, respondent came to the conclusion that the agreement between attorney [G] and [A] involved fraud and possible criminal conduct on the part of attorney [G]. However, after October 18, 1984, respondent failed to communicate with his clients and failed to take any appreciable action to protect [A's] interest with respect to [F].

About October 25, 1984, [B] visited respondent's office at 4:20 p.m., at which time respondent was not present. Therefore, [B] left respondent a handwritten letter in which she expressed her dismay that attorney [G] was not brought to justice, concern for her family's well-being in the midst of this "tragedy," and distress that she was unable to repay the creditors. In addition, [B] provided respondent with a copy of the mortgage agreement for the purchase of the building in which [F] is located. The mortgagors are listed as [H] ([G's] dog) and [I] (famous actress). Signatures of both appear on the mortgage document.

By letter dated November 16, 1984, [B] pled with respondent to take action on their case and to inform her as to the status of the matter. She also provided respondent with additional information which indicated that attorney [G] did not own [F] at the time of the sale. Respondent failed to respond. At no time did respondent communicate to his clients that he was unable to settle their claim or that he required additional funds or information to proceed with the matter.

In mid-November 1984, [B] spoke with respondent on the telephone, at which time he indicated that he intended to take action to investigate the matter and that he would keep her advised. Prior to Thanksgiving 1984, respondent gave to [B] copies of his file notes. In late December 1984, [B] telephoned respondent's home and left a message with respon-

dent's wife that unless she heard from respondent in regard to the status of her matter, she would report him to the bar association.

By letter dated January 2, 1985, respondent wrote to [B] stating that he was in the process of securing documentation and he would keep her "advised as we make progress." Subsequently, respondent failed to advise the clients of the progress, if any, he had made in regard to their case.

By letter dated March 17, 1985, [A] requested that respondent inform him as to what specific action respondent took on his case and also to return all original documents. Respondent failed to respond.

By certified mail, [B] and [A] sent a letter advising respondent that he was discharged and requested the return of all original documents, the unearned portion of his fee, and a statement of services rendered. Again, respondent failed to reply.

Respondent was advised by petitioner of the allegations of complaint by [B] and [A] in a letter of inquiry dated August 8, 1985.

Respondent answered by letter dated September 12, 1985, in which he provided a statement of services allegedly performed on behalf of his clients. The statement of services included numerous telephone calls which apparently had not taken place. Respondent also sent to his clients a letter dated September 11, 1985, purporting to forward to them their documents. However, the only document forwarded by respondent, which had not been provided to him originally by the clients, was a one-page cursory report of an investigator hired by respondent, which reported on the contents of [F's] liquor license application.

In June 1986, [B] and [A] filed a complaint against respondent with the [ ] Bar Association Committee of Fee Disputes. In August 1986, respondent agreed

to submit to binding arbitration by the Fee Disputes Committee. On March 12, 1987, the Fee Disputes Committee panel entered an award in favor of the clients in the amount of $1,000. Respondent has not complied with that determination, claiming it to be unfair.

As a result of respondent's failure to pursue the legal matter of his clients, they were unable to pursue the case against attorney [G].

[G], Esq., was disbarred by order of the Supreme Court dated August 8, 1986.

### B. *No. 89 D.B. 87, [C] Matter*

On January 14, 1980, [C] and [J], through their counsel, [K], Esq., filed suit captioned *[C] and [J] v. [L] Borough,* Court of Common Pleas, [   ] County under docket no. [   ]. The suit sought to compel Mr. and Mrs. [M], the owners of a property adjacent to the home of [C and J], to desist utilizing a neighboring vacant lot as a playground and thereby creating a nuisance. By order of May 27, 1980, the preliminary objections of the Borough of [   ] were sustained and the complaint dismissed. On October 22, 1980, [K] filed suit captioned *[C] and [J] v. [L] Borough and Borough Council et al.,* Court of Common Pleas, [   ] County, under docket no. [   ]. By order dated December 22, 1981, this suit was consolidated with no. [   ].

On March 27, 1982, [C and J] retained respondent to substitute as their counsel in the pending action. By letter dated March 27, 1982, respondent confirmed his agreement with [C and J] to represent them for a flat fee of $4,000, which [C and J] paid on the same day. Respondent promised [C and J] that he would start working on the case immediately and

that he would take the case to court for them and pursue monetary damages.

On April 5, 1982, respondent filed his appearance on behalf of [C and J]. Respondent sent a letter dated April 7, 1982, to [C and J] informing them of the above action and that he had received their file from previous counsel.

Under cover of a letter dated May 26, 1982, [K], Esq., sent to respondent two letters from Judge [N] indicating the dates scheduled for the pretrial conference and the trial.

A pretrial conference was scheduled before the Honorable [N] of the [ ] County Court of Common Pleas for June 1, 1982. Respondent failed to appear at the conference. On the date the conference was scheduled, a woman, identifying herself as respondent's secretary, called Judge [N's] secretary and advised that respondent could not attend the 9:30 a.m. conference. Judge [N's] secretary advised that no continuance would be granted due to inadequate notice. On the same day, June 1, 1982, at 10:30 a.m., respondent called Judge [N's] secretary stating he was in front of Judge [O] in [ ] and was trying to expedite the matter and that he needed at least 45 minutes to get to [ ]. Finally, on that same day at 3:40 p.m. respondent called Judge [N's] secretary to inquire about the results of the pretrial conference.

A summary of the pretrial conference was prepared by the court and mailed to respondent under cover letter dated June 4, 1982.

On June 14, 1982, [P], counsel for the Borough of [L], filed a motion for summary judgment. On the same day, [Q], Esq. filed a motion for summary judgment on behalf of defendant [M]. Copies of such were forwarded to respondent. Respondent failed to reply to the motions for summary judgment.

On August 11, 1982, Judge [N] entered an order granting summary judgment in favor of defendant [M] and an order granting summary judgment in favor of the borough defendants. By letter dated August 11, 1982, Judge [N] sent respondent copies of the orders. The entry of the orders terminated the action.

Although respondent claims to have negotiated a settlement with opposing counsel on behalf of [C and J], respondent took no such action. There is no writing to memorialize the agreement which respondent claims settled the matter. If called to testify, opposing counsel [R], Esq., [Q], Esq., and [P], Esq. would all state that they had no recollection of meeting or negotiating with respondent in reference to the [C] matter. In fact, respondent took no legal action to resolve [C and J's] legal matter. By 1983, the nuisance problem, the subject of the lawsuit, resolved itself due to circumstances relating to the owners of the property. They moved.

Between April and August 1982, [C and J] attempted to contact respondent by telephone. Respondent failed to respond to the messages which they left. By letters dated August 10, 1982, and September 17, 1982, [C] wrote to respondent requesting information as to the status of his legal matter. Respondent failed to reply.

By letter dated September 24, 1982, respondent arranged an office appointment with [C and J]. [C and J] confirmed with respondent's office that they would meet with him at 4 p.m. on October 19, 1982. When [C and J] arrived at respondent's office on the scheduled date, respondent was not present. Instead, [C and J] were met by [S], Esq., who was employed by respondent. Attorney [S] advised that he was not informed of the [C] matter and that respondent would be in contact with them. There-

after, respondent took no further action with respect to [C and J's] case nor did he contact them for a period of one year. As stated above, the problem with respect to the vacant lot resolved itself.

During the period between October 1982 and October 1983, [C and J] attempted to communicate with respondent by telephone, but could not contact him because he repeatedly moved his office without any type of notice to them.

By letter dated October 19, 1983, respondent informed [C and J] of the opportunity to purchase the adjacent property which was the subject of the alleged nuisance. Thereafter, [C and J] telephoned respondent's office on several occasions to discuss the contents of the letter and acquire information as to the status of their matter. However, respondent was not available at the time and failed to return their calls.

By letter dated November 2, 1984, to respondent, [C] requested a final accounting and a refund of the unearned portion of the $4,000 fee. Respondent acknowledged receipt of the [C] letter in a letter dated November 20, 1984, in which he stated his intentions to review their file and "make the necessary adjustment on the fee paid for professional services rendered." However, respondent failed to refund any portion of the fee paid by [C and J].

On June 6, 1985, [C and J] submitted this dispute to the [   ] Bar Association's Fee Disputes Committee. Respondent contacted [C] and offered a refund of $1,000 which [C] did not accept.

By letter dated November 4, 1985, [T], Esq., chair of the Fee Disputes Committee panel, notified the parties of a hearing date for November 14, 1985. On November 13, 1985, respondent's secretary notified attorney [T] that respondent had been injured and was unavailable to attend the hearing scheduled on

November 14, 1985. By letters dated November 13, 1985, and November 17, 1985, attorney [T] asked respondent to notify him when he would be available for the hearing. Respondent did not respond to attorney [T's] inquiries. By letter dated February 18, 1986, attorney [T] notified respondent that the hearing was scheduled for March 10, 1986. Respondent did not attend the fee dispute hearing on March 10, 1986, but had a letter delivered that day. On March 28, 1986, the fee disputes panel issued an advisory opinion in favor of [C and J], concluding that respondent should refund the entire $4,000 fee with interest at 10 percent per annum, from March 27, 1982. By certified letter dated May 7, 1986, [C and J] forwarded to respondent a copy of the Fee Disputes Committee's advisory opinion and demanded payment by May 19, 1986. Respondent failed to return to [C and J] the $4,000 plus interest, nor did he respond to the letter.

## C. *No. 15 D.B. 88, [D] Matter*

On December 10, 1985, [D] retained respondent to represent him in pending matters, including a hearing on a [   ] detainer and five [   ] cases, captioned *Commonwealth of Pennsylvania v. [D]*, and docketed, respectively at: Court of Common Pleas no. [   ], [   ] Municipal Court no. [   ], Court of Common Pleas no. [   ], [   ] Municipal Court no. [   ], [   ] Municipal Court no. [   ].

At their initial meeting, [D] paid respondent $1,500 and agreed to make an additional $5,000 payment. Thereafter, by letter dated January 15, 1986, [D] discharged respondent as his attorney and demanded respondent return the unearned portion of the fee. By letter dated March 20, 1986, [D's] sister, [U], also advised respondent that he was

discharged as counsel. Despite his notice of discharge, respondent failed to promptly petition the court to withdraw in [D's] pending cases.

Specifically, in each case, respondent's actions created the same scenario: Respondent entered his appearance on behalf of [D]; argued pretrial motions; failed to appear in court at the scheduled time; caused the case to be continued; respondent withdrew from the case; and eventually the case was continued and new counsel entered his appearance.

## D. *No. 23 D.B. 88, [E] Matter*

On August 29, 1978, [E] was injured as a result of a motor vehicle accident involving SEPTA. On September 5, 1978, respondent and [E] entered into a contingent fee agreement wherein respondent was to receive 40 percent of the gross recovery if the case was settled before trial.

On October 15, 1979, [E] was arrested on criminal charges in [   ] and in November 1979, [E] retained respondent to represent him in the matter. By January 1980, the October 1979 criminal matter was concluded.

In May 1980, [E] was injured as a result of a motor vehicle accident in which the other party involved was [V]. Shortly thereafter, [E] requested respondent to represent him in the matter and entered into a 40 percent contingent fee agreement.

On June 29, 1989, [E] was arrested and criminally charged in [   ]. In early July 1980, [E] retained respondent to represent him in those criminal charges. It was agreed that respondent's fee for services in this criminal matter was to be paid from the proceeds of [E's] "[V] claim." The above criminal matter was completed in November 1980.

In August 1981, respondent reached a settlement on behalf of his client in the matter captioned *[E] v. SEPTA and [W]* in the amount of $5,000. Respondent made a distribution of the funds to [E] in the amount of $1,789.50. Respondent prepared a distribution statement which reflected a withholding of $750 annotated "Legal Fee: *Commonwealth v. [E]*, November 14, 1980." The withholding of the $750 represents payment for the second criminal matter which was to have been paid from the proceeds of the "[V] Claim." Thus, by August 1981, [E] had satisfied his legal fee obligation to respondent.

In July 1983, respondent settled the [V] matter in the amount of $4,500. However, respondent did not obtain [E's] consent to settle the case. Furthermore, respondent failed to advise [E] of the settlement. Under cover of a letter dated July 22, 1983, [X] forwarded to respondent a draft in the amount of $4,500 payable to [E] and to respondent. [X] also forwarded a release for [E's] signature. Respondent negotiated the [X] draft by endorsing his own name and forging or causing to be forged [E's] name. The signature on the draft, purporting to be that of [E], was not his and was executed without his knowledge or consent. Respondent returned to [X] a release dated July 26, 1983, signed in the name of [E] and witnessed by respondent. The signature on the release was not that of [E] and was not executed with his knowledge or consent. The board therefore finds this document was also forged by the respondent. The [X] draft was deposited into respondent's attorney escrow account and respondent utilized the proceeds of the draft for his own personal purposes. Respondent did not prepare a statement of distribution with respect to the *[E] v. [V]* settlement at the time the funds were received.

On or about February 2, 1984, [E] met with respondent and inquired as to the status of his case. Respondent advised [E] that the case had not been settled. This statement was false. [E] advised respondent that he was not working and needed money. In February 1984, respondent gave [E] funds totaling $1,000 for which [E] signed a receipt annotated "[E] v. [V]." Respondent advised [E] that the $1,000 would be deducted from the proceeds of any settlement obtained in the *[E] v. [V]* matter.

[E] subsequently learned that a draft for $4,500 had been issued by [X] in settlement of his claim against [V]. By letter dated May 8, 1984, [Y], Esq., [E's] attorney in another matter, requested an accounting of the funds respondent had received on behalf of [E]. On May 15, 1984, respondent called [Y] and promised to send an accounting which would reflect that [E] owed respondent fees from prior criminal matters which had been deducted from the settlement proceeds. By letter dated May 18, 1984, attorney [Y] again requested respondent to provide an accounting and confirmed other aspects of the May 15, 1984, conversation. Respondent failed to respond.

A letter of inquiry concerning [E's] matter was sent to respondent on May 31, 1984, by the Office of Disciplinary Counsel. By letter dated July 10, 1984, respondent answered the letter of inquiry and alleged that he had notified [E] of the settlement by letter dated July 29, 1983, a copy of which he provided. However, [E] had never seen the July 29, 1983, letter before he complained to petitioner. The letter was prepared and submitted to falsely substantiate his claim of notification to [E] of the receipt and distribution of the settlement proceeds. In Sep-

tember 1984, respondent provided to [E] a statement of distribution to [E] with respect to *[E] v. [V]*.

On October 9, 1984, respondent provided to petitioner a letter dated July 23, 1983, which purported to forward to [E] the draft and release for his signature, which letter had not been sent by respondent to [E] in July 1983 or any time thereafter. The board also finds that this letter was prepared and intentionally submitted by respondent to falsely substantiate his claim that he had timely forwarded the draft and release to [E] for his signature.

## ADDITIONAL FINDINGS OF FACT

Respondent has a prior disciplinary record consisting of three informal admonitions, App. G, administered, respectively, July 27, 1982, for neglect in a divorce action; March 23, 1983, failure to maintain adequate records of client funds in his possession and failure to maintain adequate records to account to his client; and May 25, 1983, neglect. In this case the [ ] Circuit dismissed an appeal due to respondent's failure to: (1) file a brief after three extensions totaling five months; (2) respond to a motion to dismiss; and (3) comply with a direct court order.

## DISCUSSION

### A. Preliminary Matter

A threshold issue of whether or not to dismiss the charges is presented in the [E] matter. It seems the original check and release containing the alleged forged signature of [E] were lost during transmission of the original record from the hearing committee to the Office of Disciplinary Counsel. Respondent has consistently moved to dismiss the [E] charges,

claiming he has been prevented from having his handwriting. expert opine regarding the genuineness of the signature. The Office of Disciplinary Counsel, similarly, offered no expert testimony that the signatures were forged. However, [E] testified that he did not sign the documents, nor did he authorize anyone else to do so. The hearing committee found as a fact, as does this board, that the respondent had forged [E's] signature.

There is no question that the Office of Disciplinary Counsel did not intentionally suppress the evidence in question. The loss was accidental. However, Pennsylvania law seems to hold that where evidence is lost or suppressed, the good faith or lack thereof by the prosecution is immaterial since the issue is not the punishment of society for the prosecutor's misdeeds, but rather avoidance of an unfair trial to the accused.[1]

In the federal courts, however, defendant's constitutional rights are not impaired (where evidence is suppressed) unless the defendant can show bad faith on the part of the prosecution. *Arizona v. Youngblood,* 109 S.Ct. 333, 337 (1988). In *Youngblood,* the defendant was convicted of child molestation, sexual assault and kidnapping. The Arizona Court of Appeals reversed his conviction on the ground that the state had failed to preserve semen samples from the victim's body and clothing. The U.S. Supreme Court granted certiorari to consider the limited issue of the extent to which the due process clause of the federal Constitution requires the state to preserve evidentiary material that might be useful to a criminal defendant. The victim identified the defendant at a lineup. The identity issue (as analyzed from blood samplings and semen samplings taken at the

---

1. Cf. *Commonwealth v. Hallowell,* 477 Pa. 232, 383 A.2d 909 (1978).

hospital which were refrigerated) was inconclusive to establish the defendant as the perpetrator. However, expert criminologists testified that had the state refrigerated the boy's underwear and tee shirt (the state had kept the underwear and tee shirt but had not refrigerated them), a positive identification or lack thereof may have been possible from a sampling of refrigerated semen stains on the underclothing. Respondent's principal defense was that the victim had erred in identification and that the state had failed to retain evidence which would have been exculpatory for the defendant. A jury returned a verdict of guilty which was reversed on appeal on the basis that, "When identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as a perpetrator, such loss is material to the defense and is a denial of due process." 153 Ariz. at 54, 734 P.2d at 596, quoting *State v. Escalante,* 153 Ariz. 55, 61, 734 P.2d 597, 603 (App. 1986). The conviction was reversed on the basis of the expert testimony at trial, that timely performance of tests with properly preserved semen samples could have produced results that might have completely exonerated the defendant. The appellate court reached its conclusion even though it did "not imply any bad faith on the part of the state." 153 Ariz. at 54, 734 P.2d at 596. The U.S. Supreme Court, in an opinion written by Chief Justice Rehnquist, reversed. The court's holding follows:

"The Due Process Clause of the 14th Amendment, as interpreted in *Brady [v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963)], makes the good or bad faith of the state irrelevant when the state fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when

we deal with the failure of the state to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the court in [*California v.*] *Trombetta, supra,* 467 U.S. at 486, 104 S. Ct. at 2532, that '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.' Part of it stems from our unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause, see *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.''

Respondent's argument therefore, that the loss of the checks by the Office of Disciplinary Counsel violates his constitutional rights, is dismissed based upon the *Youngblood* decision.

Additionally, it is to be noted that petitioner is not required to establish misconduct through direct ev-

idence and can prove its case solely by circumstantial evidence. *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981); *Office of Disciplinary Counsel v. Kissel,* 497 Pa. 467, 442 A.2d 317 (1982); *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872.

Based on the above, the board denied respondent's motion to dismiss the [E] complaint.

## B. *Discussion of Charges*

We now turn to a discussion of each individual complaint.

### 1. *[B]/[A] Matter*
### 2. *[C] Matter*

The above two matters will be discussed together since the conduct in which respondent engaged demonstrates virtually identical patterns of conduct in both matters. As indicated by the hearing committee:

"In both cases, respondent was retained by relatively unsophisticated clients, requested and was paid a retainer, promised immediate and effective action, provided minimal services, failed to communicate with the clients concerning the illegal matter and became inaccessible to them, and failed to refund the unearned portion of the fee as determined by fee dispute committees." Hearing Committee report at 28.

On the issue of neglect, the following discussion as found in *In re Anonymous, No. 24 D.B. 80,* 20 D.&C. 3d 214, 225, is pertinent here:

"With regard to the negligent aspects of respondent's conduct hereunder as the same amount to a violation of D.R. 6-101(A)(3) prohibiting an attorney

from neglecting a legal matter entrusted to him there must first be defined the kind and type of negligence or neglect which fits the meaning of neglect as used in this rule.

Such neglect is not an instance of ordinary neglect per se such as inadvertent neglect without more even if such neglect should result in some loss or inconvenience to a client. Adequate remedies exist for this in the way of malpractice actions in the civil courts. Such neglect to be violative of D.R. 6-101(A)(3) must fall within one of the following three categories: (1) Several instances of neglect which happen during the same general period of time, which evidence a pattern of neglect and which result in loss to the client; (2) An instance of neglect and resultant loss to the client which was allowed to occur by a lawyer who had been repeatedly reminded or warned by the client or the client's agent against the same and before the same occurred or who had been reminded or warned against the same by authorities such as Disciplinary Counsel and before the same occurred; or (3) An instance of neglect resulting in a loss to the client and built upon a prior history or record of neglect resulting in a prior loss to a client and involving the same lawyer. Client loss is an important factor in all of the above three categories because until such loss occurs, the client has sufficient remedy in removing the case or matter from the lawyer involved and taking it to another lawyer.''

In the [B] matter, respondent was repeatedly reminded by his clients of the problem. [B] constantly called respondent and even went so far as to supply him with her own analysis of the case. In the [C] case, respondent likewise failed to communicate with his client and failed to appear at a pretrial conference with a judge and failed to respond to a

motion for summary judgment. Respondent argues that repeated phone calls from his client were harassing and, therefore, he did not return their calls as he otherwise would have done. He further described his clients as unreasonable and belligerent. The board cannot accept the client's repeated attempts to secure information, even bordering on "pestering" as excusing a lawyer from further communications with his client. A representative view of the plea for information and performance may be found in exhibit P-17, a letter from [B] to respondent in which she pleaded for help, making repeated reference to the jeopardy in which her and her son-in-law's life savings were placed by respondent's inactivity. The following language from the opinion disbarring former Vice President Spiro T. Agnew is appropriate:

"Few vocations offer as great a spectrum for good and honorable works as does the legal profession. *The attorney is entrusted with the life savings and investments of his clients.* He becomes the guardian of the mentally deficient, and potential savior for the accused. He is a fiduciary, a confidant, an adviser, and an advocate. However, the great privilege of serving in all of these capacities does not come without the concomitant responsibilities of truth, candor and honesty. In fact, it can be said that the presence of these virtues in members of the bar comprises a large portion of the fulcrum upon which the scales of justice rest. Consequently, an attorney's character must remain beyond reproach." *Maryland State Bar Association Inc. v. Agnew,* 271 Md. 543, 318 A.2d 811 (1974). (emphasis added)

To further compound matters, respondent, in the [C] case, made false claims of having negotiated a settlement. He told an incredible story to his clients and to the hearing committee about negotiations

when the record is totally void of any evidence that such negotiations took place. In fact, the record contains statements from other lawyers in the case that they never talked to respondent or negotiated with him. Respondent further claimed that he notified his clients of his change of addresses but there was no supporting evidence in the record of such notification. Lastly, respondent argued in the "[C]" matter, that the claimant had an affirmative duty to discharge him and failing to do so, he was relieved of any further obligation to communicate. This argument is totally deficient.

Further aggravating circumstances are found in respondent's failure to return $1,000 in fee to his client after a fee dispute committee found he should do so and to which binding arbitration, the respondent voluntarily submitted. In the "[C]" matter respondent also failed to refund a fee in an advisory opinion of a fee dispute committee to which he did not voluntarily submit.

### 3. The [D] Matter

The Office of Disciplinary Counsel takes exception to the hearing committee's non-finding of any infraction in the [D] matter. A lengthy discussion of whether or not respondent violated any disciplinary rules does not seem justified in this case. Accepting the findings of fact made by the hearing committee, it seems apparent that respondent (although not in a clearly flagrant manner) may have negatively impacted the administration of justice in violation of D.R. 1-102(A)(5). It is further apparent that respondent technically violated D.R. 2-110(A)(2) which requires a discharged attorney to petition the court for leave to withdraw. However, the board concludes that in the overall analysis of all of respon-

dent's conduct under review, the infractions in the [D] matter appear to be de minimis and non-prejudicial; therefore, the charges therein are dismissed.

### 4. *The [E] Matter*

The important issue in the [E] matter was the finding of forgery and the deception committed in an attempt to cover up the lack of communication with respondent's client. The forgery issue was alluded to in the discussion of the threshold issue at the onset of the discussion section of this report. The board, having found forgery, must consider the discipline appropriate for such impropriety. A review of the cases decided on this issue by the Supreme Court makes it apparent to the board that a combination of forgery and deceit would in itself sustain disbarment.

In the case of *Office of Disciplinary Counsel v. Braun*, 520 Pa. 157, 553 A.2d 894 (1989), respondent was found guilty of neglecting an estate matter and forging his client's signature on 15 separate occasions in order to withdraw funds from the estate for his personal use totaling $1,962.94. Although the discipline imposed in this case was a two-year suspension, it was based upon mitigating circumstances; namely, finding that respondent had a psychiatric disorder which was a causal factor in producing respondent's misconduct. However, it was pointed out by the court that such misbehavior would warrant the most severe sanction of disbarment without the significant mitigating psychiatric disorder.

In the case of *Office of Disciplinary Counsel v. Wittmaack*, 513 Pa. 609, 522 A.2d 522 (1987), the respondent was found guilty of misconduct, includ-

ing failure to advise his client of a conflict of interest and of forging his client's signature. The discipline imposed by the Supreme Court was disbarment. Although Justices Hutchinson, Larsen and Zappala dissented, the dissent was based on a failure of the Disciplinary Board to specifically find that respondent had forged his client's signature. The inference seems clear that had there been a forgery finding, the dissent would have agreed with disbarment. In the case at bar, the finding of forgery is clear which leads the board to its conclusion of recommending the ultimate discipline. For further cases involving disbarment in which forgery was present, see *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986), and *Office of Disciplinary Counsel v. Kissel,* 497 Pa. 467, 442 A.2d 217 (1982).

## C. *General Discussion*

If respondent's conduct involved merely a neglect problem, one could conceivably craft an argument engendering some modicum of sympathy for him. He was undoubtedly enduring hard times.[2]

However, where as here, respondent sought to defend the neglect charge with falsified documents,[3] his conduct of deplorable, but simple, neglect, takes on the added mantel of active and premeditated deceit—the most loathsome charge one can levy against a lawyer. It is the deceit aspect of this respondent's behavior coupled with the forgeries (as opposed to the neglect charges) which requires the Disciplinary Board to recommend disbarment in

---

2. From September 1981 to August 1982, respondent's office was situated at four different locations including his home. In July 1981, he sustained a concussion; two car accidents in January 1982 and again in October 1985; and in May 1982, his hand was severely cut requiring 12 stitches.

3. Findings in the [E] matter, *supra,* at 134-137.

order to protect the unaware and vulnerable who might, in the future, wish to engage respondent as their trusted legal representative.

Lastly, the board finds the following to be aggravating circumstances:

(1) Respondent's failure to admit any wrongdoing;

(2) The absence of any remorse;

(3) No restitution of fees in spite of an award of one fee dispute committee and a recommendation of another;

(4) Prior informal admonitions.

From the first to the third informal admonitions previously imposed, through the four separate charges here considered, respondent has left a trail of repeated and increasingly more severe and offensive violations of acceptable legal and ethical conduct. The disciplinary system must intercede with radical punishment to prevent any further progression of misconduct with its attendant public harm.

## CONCLUSIONS OF LAW

Respondent has violated the following Disciplinary Rules:

### A. *[A]/[B] Matter*

(a) D.R. 2-110(A)(2)—A lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his clients;

(b) D.R. 2-110(A)(3)—A lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned;

(c) D.R. 6-101(A)(3)—A lawyer shall not neglect a legal matter entrusted;

(d) D.R. 7-101(A)(1)—A lawyer shall not intentionally fail to seek the lawful objectives of his client through reasonably available means permitted by law; and

(e) D.R. 9-102(B)(4)—A lawyer shall promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

## B. [C] Matter

(a) D.R. 2-110(A)(2)—A lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his clients;

(b) D.R. 2-110(A)(3)—A lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned;

(c) D.R. 6-101(A)(3)—A lawyer shall not neglect a legal matter entrusted;

(d) D.R. 7-101(A)(1)—A lawyer shall not intentionally fail to seek the lawful objectives of his client through reasonably available means permitted by law; and

(e) D.R. 9-102(B)(4)—A lawyer shall promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

## C. [D] Matter

The board dismisses the charges in the [D] matter.

## D. [E] Matter

(a) D.R. 1-102(A)(3)—A lawyer shall not engage in illegal conduct involving moral turpitude;

(b) D.R. 1-102(A)(4)—A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(c) D.R. 1-102(A)(6)—A lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law;

(d) D.R. 9-102(B)(1)—A lawyer shall promptly notify a client of the receipt of funds, securities, or other properties;

(e) D.R. 9-102(B)(3)—A lawyer shall maintain complete records of all funds, securities and other properties of a client coming into possession of a lawyer and render appropriate accounts to his client regarding them; and

(f) D.R. 9-102(B)(4)—A lawyer shall promptly pay or deliver to a client as requested by a client the funds, securities, or other properties in possession of the lawyer which the client is entitled to receive.

## RECOMMENDATION

Based on the foregoing discussion, the Disciplinary Board recommends that respondent be disbarred from the practice of law. The board recommends further that, pursuant to Rule 208(g), Pa.R.D.E., respondent be directed to pay the necessary expenses incurred in the investigation and prosecution of this proceeding.

Ms. Heh did not participate in the adjudication.

## ORDER

And now, April 30, 1991, the recommendation of the Disciplinary Board dated April 19, 1990, is accepted, and it is hereby ordered that [respondent] be and he is disbarred from the bar of this Commonwealth, and he shall comply with all the provisions

150

of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Chief Justice Nix did not participate in the consideration or decision of this case.